[Civ. No. 2534. Third Appellate District.—November 16, 1923.]

GEORGE A. ANDERSON, Appellant, v. STANDARD LUMBER COMPANY (a Corporation), Respondent.

[1] AGENCY — OSTENSIBLE AUTHORITY — STATEMENTS OF AGENT — KNOWLEDGE OF THIRD PERSON — LIABILITY OF PRINCIPAL. — Where an agent, acting in excess of his express authority, enters into a written contract employing a third person to work for the principal, the latter is not bound by such act of its agent, upon the theory of ostensible agency, where there is no showing that at the time of his employment said third person had any knowledge of the agent's authority, except from the agent's statement to him or from the agent's written contract of employment or the letter of the principal authorizing the employment of men for certain specified work, upon specified terms, neither of which writings authorized the employment of said third person; and the principal

is not bound by its agent's statements as to the extent of his authority.

[2] CONTRACTS — SUBSTITUTION OF ORAL FOR WRITTEN AGREEMENT. — Even if such written contract of employment had been binding upon the principal, nevertheless, when said third person, on his arrival, stated that he could not do the work for which he had been employed and orally agreed to do other work at a smaller salary, such act on his part constituted an abandonment of his first written contract and the substitution of a new oral contract in its stead, and not an oral modification of the written contract.

[3] ID.—VOLUNTARY QUITTING OF JOB—LIABILITY FOR RAILROAD FARE. Where the contract for the employment of plaintiff's assignor provided that if he remained "on the job for a period of six months" his railroad fare from the east to defendant's lumber-mill would be paid him by defendant, and he quit the job of his own accord after working about two months, defendant was not liable for the payment of such fare.

APPEAL from a judgment of the Superior Court of Tuolumne County. G. W. Nicol, Judge. Affirmed.

The facts are stated in the opinion of the court.

H. W. Zagoren for Appellant.

J. B. Curtin for Respondent.

FINCH, P. J.—Plaintiff sued to recover for services alleged to have been performed by him for defendant and for the amount of a claim of one Ole Orr against defendant which had been assigned to plaintiff. The court found against plaintiff and gave defendant judgment for costs. This appeal is from the judgment.

July 28, 1920, the defendant employed P. S. Dainard to act as superintendent of its sawmill at Standard, Tuolumne County, the contract of employment being in the form of a letter, signed by D. H. Steinmetz, defendant's general manager, containing the following:

"Per the arrangements made with you to-day, we will agree to pay you on the basis of $4000.00 per year, to take the position as superintendent at Standard, in full charge of sawmill, pond and yard. . . . It is understood that you will make your arrangements to be at Standard not later than the 15th to the 20th of August."

Dainard entered upon the discharge of his duties as such superintendent about the 1st of September, 1920.

For many years prior to his employment by defendant, Dainard had occupied similar positions in various eastern and Canadian sawmills and had a wide acquaintance with men working therein. The defendant desired to secure the services of some of these men and, on July 28, 1920, Steinmetz gave Dainard, who was about to go to Minnesota to bring his family thence to Standard, written authorization to employ men as follows:

"In connection with the help that we would like to have you pick up, we can use: 6 or 8 good first class lumber pilers, and we will pay the following rates: 5/4 and 6/4 and 8/4 & better, 60¢ per thousand feet; 4/4, 67½¢ per thousand feet. . . . All piles will be covered with 1½" box lumber, which will be paid for at the regular 6/4 rate, 60¢.

"We would like to have you look up two or three pond men to work on the water at 57½ per hour; 1 or 2 setters, 70¢ per hour; doggers, 62½¢ per hour; 2 edgermen, 75¢; 2 trimmermen, 65¢; 2 oilers, 60¢. We can use from six to twelve good mill men, common laborers, at 50¢ per hour.

"You can say to the men that you employ that the work will be steady the year around, and we will furnish transportation to such men as you select, with the understanding that it is to be paid back to us, and with the further understanding that if they stay with us for six months that the company will refund the railroad fare."

Dainard testified that Steinmetz orally authorized him to employ men and said: "You know what you need as well as I do. However, I better give you some letter so it will bear out our part. You can hire what you need." Steinmetz denied having made the statement and further testified that the only authority given Dainard to employ men was that contained in the letter quoted and that defendant never departed from such written authorization. Steinmetz also testified that Dainard was not in the employ of defendant during August, 1920. August 16, 1920, in Minnesota, Dainard and plaintiff executed the following instrument:

"This is to evidence that Geo. A. Anderson has this day been employed by the Standard Lumber Company as an all around yard man at $250 per month looking after hauling out lath lumber and piling.

"Transportation to be furnished to said employee by said company to the place where work is to be performed, the same to be deducted from his wages; but in case said employee works continuously for said company for a period of six months the amount so deducted for said transportation is to be refunded to him by said company.

"Dated this 16 day of August, 1920.

"THE STANDARD LUMBER COMPANY.

"By P. S. DAINARD, Agt.

"GEO. A. ANDERSON."

While in Minnesota, after the execution of the instrument last quoted, the plaintiff procured eighteen men for the defendant at Dainard's request, the latter agreeing to pay plaintiff his expenses incurred in procuring them. Plaintiff and these eighteen men then came to California, arriving at Standard August 25th. Plaintiff testified that he presented his agreement with Dainard to Steinmetz and Ben J. Ziegler, who was general yard superintendent, on August 26th and that Steinmetz looked at the contract and then said: "I am satisfied you are just the kind of man we want." Plaintiff further testified that nothing was then said about paying him less than $250 a month. Steinmetz testified that he did not authorize Dainard to incur any expenses in procuring men, that he did not know that plaintiff had a contract until after the latter had been discharged, and that Ziegler had authority to employ men and that he, Ziegler, put plaintiff to work. Plaintiff testified that he was employed by Dainard as green lumber foreman "to handle the green lumber from the mill saw to the pile." Ziegler testified that on plaintiff's arrival at Standard "he showed me a contract but I didn't read the contract." "I gave it back to him without reading it." "He told me he was hired as a green lumber-yard foreman, and he further stated that he didn't feel competent, owing to the different conditions that existed here and back there, and he asked me to keep on the man we had as green lumber foreman until he got acquainted." W. H. Cross, who was yard foreman in charge of the green lumber at the time of plaintiff's arrival, testified that the latter said to the witness: "You stay three or four weeks, I want to get on to the lumber," and further said "he couldn't handle the job," that "he didn't know sugar pine from white pine." Ziegler testified that plaintiff agreed to take charge of "the

green lumber chain at nights'' at $225 a month. He worked in this capacity for six weeks, at the end of which time defendant ''let the chain out by contract.'' Ziegler then offered plaintiff work in scaling lumber at sixty-five cents an hour, but the plaintiff declined. Two or three days later plaintiff was given work in the box factory. Nothing seems to have been said at that time relative to the wages he was to receive in the box factory. He was paid at the rate of $5 a day, the wages paid others for like work. After working there for a few days plaintiff left the factory one evening twelve minutes before the whistle blew for the men to cease work and he was thereupon discharged. He admitted that he left six minutes early. The plaintiff has received payment for his services at the rate of $225 a month for the time he had charge of the green lumber chain. He refused to accept payment at the rate of $5 a day for the time he worked in the box factory and took the matter up with the state labor commissioner. Defendant thereupon paid the amount due plaintiff to the commissioner. There was no attempt made to show that the services rendered were reasonably worth more than the amounts paid therefor.

Appellant contends that the defendant is bound by Dainard's agreement to make payment at the rate of $250 a month, notwithstanding the fact that Dainard exceeded his authority in making the agreement. *Whitton* v. *Sullivan,* 96 Cal. 480 [31 Pac. 1115], is cited in support of this contention. In that case the defendant's attorney had employed the plaintiff to take and transcribe testimony in an election contest at a certain rate per folio, and the services had been performed without knowledge on the part of plaintiff that the defendant had placed a limit on the price to be paid for the work. The court said:

''Bowden was authorized by appellant to make a contract with respondent to perform this work, and under such authorization he made a contract with respondent, who performed the work thereunder. Appellant's cause of complaint is, simply, that his agent, Bowden, exceeded the limitations placed upon his powers, by contracting to pay respondent a greater price for the work than was included in his authority of agency. But this is a matter between the principal and his agent, and with which the party doing the work has no concern.

"This principle is clearly declared in Mechem on Agency, section 283, where the author, speaking as to general and special agents, says: 'In either case, the question of the authority of the agent must depend, so far as it involves the rights of innocent third persons who have relied thereon, upon the character bestowed, and not upon the instructions given.'"

In the employment of Whitton, Bowden had not exceeded the authority usually exercised by an attorney in the conduct of his client's case. In Mechem on Agency, second edition, section 710, it is said: "The criterion in this case, as in others, is the character bestowed by the principal. . . . Although the agent violates his instructions or exceeds the limits set to his authority, he will yet bind his principal to such third persons, if his acts are within the scope of the authority which the principal has caused or permitted him to appear to possess. But if the agent be not held out as one possessing other than the limited and restricted authority, then the instructions and the authority may coincide." This statement of the law is in harmony with section 2317 of the Civil Code, which provides: "Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess." In *Harris* v. *San Diego Flume Co.*, 87 Cal. 526, 528 [25 Pac. 758], it is said: "There are two essential features of an authority of this character, viz.: the party must believe that the agent had authority, and such belief must be generated by some act or neglect of the person to be held. A belief founded on the agent's statements is not sufficient." **[1]** The evidence does not show what information plaintiff had relative to Dainard's authority at the time the contract between them was executed. It does not appear that he could have had any knowledge thereof except from Dainard's statements to him, or from Dainard's contract with defendant or the letter of authorization to employ men. The defendant was not bound by Dainard's statements as to the extent of his authority, and neither the contract nor the letter show any authority in Dainard to execute the contract on which the suit is based. The letter did not authorize Dainard to employ a "green lumber foreman" or "an all around yard man" or to agree to pay any man $250 a month. Neither did Dainard have authority,

on August 16, 1920, merely by virtue of his contract to act as superintendent, to employ men. His authority at that time was such only as was specially given him by the defendant's letter of authorization. He did not enter upon his duties as superintendent until after he had employed plaintiff. Dainard's contract with defendant provided that he was to be at Standard not later than August 15th or 20th. This time was extended. He was in North Dakota on his way to California, August 28th. He was not in the employ of defendant as superintendent during August. From the foregoing it clearly appears that the defendant was not bound by the agreement on which the plaintiff sues.

[2] Even if the contract had been binding on defendant, nevertheless, when plaintiff, on his arrival, stated that he could not do the work for which he had been employed and agreed to do other work at a smaller salary, he thereby abandoned the first contract. It is not a question of the oral modification of a written contract, but an abandonment thereof and the substitution of the oral contract in its stead. It is true that plaintiff testified that he did not state that he could not do the work for which he was employed by Dainard and denied that he agreed to accept other work at $225 a month, but this testimony only created a conflict in the evidence which was exclusively for the determination of the trial court.

Dainard told plaintiff that the latter's salary was to commence from the date of the written agreement between them and that the defendant would reimburse him for his expenses incurred in procuring men for defendant. From what has been said, it appears that Dainard was without authority to so bind the defendant or to employ anyone to procure men for defendant.

[3] Ole Orr was employed by Dainard to pile lumber at certain rates per thousand feet. The contract provided that if he remained "on the job for a period of six months" his railroad fare from Minnesota to Standard would be paid him by the defendant. He worked for defendant "close to two months" and was paid for his services. He claimed reimbursement from defendant in the amount paid by him for transportation and assigned his claim therefor to plaintiff. The complaint alleges that he was wrongfully discharged and is therefore entitled to such reimbursement, even

though he did not "remain on the job" for six months. Orr testified as follows: "Q. Why did you leave? A. This day I got sore. Mr. Ziegler and his foreman was out there. Q. What was the foreman's name? A. Bill Cross. Q. What happened? A. He said go and get your time. . . . Q. You said awhile ago that you were kicking about it? A. Because every time I wanted to spot the lumber, the teamster would leave it three or four hundred feet from the loads. . . . Q. Then you went to the foreman and Mr. Ziegler and Mr. Cross? A. I wanted to get some of the lumber spotted so that I could work. Q. What was said? A. Said if I didn't like it here to go and get my time. Q. Then what did you do? A. I went and got my time. Q. You did not offer to do any other work? A. No. . . . Q. And your [work] was not satisfactory to either one of the bosses, Cross or Ziegler, is that correct? A. He told the boss my work was satisfactory, and he didn't want me to go, and that he would have the lumber spotted and I didn't like that idea that I should sit there and wait every day for the lumber to come in. Q. You didn't like to wait? A. We had to work, contract, and didn't want to sit there and do nothing; like to make a few dollars. . . . Q. And by spotting lumber you mean putting the lumber at a certain point? A. Putting it where it is supposed to be piled. . . . I was fired." In relation to the same subject matter, Ziegler testified as follows: "Did he quit voluntarily or was he discharged? A. He said he was going to quit." Orr left the employ of defendant October 22d. During the first half of September he earned and was paid $143.12; during the first half of October, $117.62; and from the middle of October to the time he quit, $41.50. During the latter period he "laid off a couple of days." The record does not show what he earned during the second half of September. It thus appears that his average earnings were in excess of $250 a month, and hence it may fairly be inferred that his work was not greatly interfered with by defendant's failure to spot cars as he desired.

But one point is relied on for a reversal of the judgment in so far as the Orr claim is concerned. In his brief appellant says: "The only question in this matter is, did Ole Orr quit of his own accord, was he discharged with cause, or was he discharged without cause?" The only inference to be drawn

from Orr's own testimony is that he quit of his own accord. He testified that he was "fired," but this conclusion can be given no weight against the facts related by him, which show that he voluntarily quit his employment.

The judgment is affirmed.

Hart, J., and Plummer, J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on January 16, 1924.